# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 22, 2020

Lyle W. Cayce
Clerk

No. 19-20688

Joseph Cotropia,

*Plaintiff—Appellant*,

*versus*

Mary Chapman, *Individually*,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:16-CV-742

Before Smith, Clement, and Oldham, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Joseph Cotropia sued Mary Chapman, an investigator for the Texas Medical Board ("TMB"), under 42 U.S.C. § 1983 for searching his medical office and seizing documents without a warrant. The district court granted Chapman's motion for summary judgment on the basis of qualified immunity ("QI"). We affirm.

I.

On February 13, 2015, the TMB issued a Final Order revoking Cotro-

No. 19-20688

pia's medical license[1] because he had improperly prescribed controlled substances and had directed and supervised an unregistered pain management clinic ("PMC"), an entity that needed to be registered under Texas law. TEX. OCC. CODE § 168.101. The TMB's Final Order instructed Cotropia to "immediately cease practice in Texas," explaining that violations could result in "disciplinary action by the Board or prosecution for practicing without a license in Texas."[2]

But Cotropia, by his own admission, continued to practice after the February 13, 2015, revocation, until March 20, 2015. After the TMB received a complaint against Cotropia, the TMB sent Chapman to execute an administrative subpoena at Cotropia's office on March 27, 2015.[3] The sub-

---

[1] *In re Cotropia*, SOAH Dkt. No. 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 (Feb. 13, 2015), https://perma.cc/A2DX-QDBU ("Final Order").

[2] Final Order at 15. Cotropia asserts a slew of so-called "*Tolan* violations" under *Tolan v. Cotton*, 572 U.S. 650 (2014) (per curiam), arguing that the district court improperly weighed the evidence by resolving disputed issues in favor of Chapman. Cotropia insists that he was not required to stop practicing medicine until March 20, 2015, because that was the day that the TMB denied his rehearing and the Final Order became final. But the Final Order required Cotropia to cease immediately. The denial of his motion for rehearing resulted only in "[a]dministrative finality," namely an exhaustion of the TMB's review for purposes of appeal. 22 TEX. ADMIN. CODE § 187.37(*l*); *see Lawson v. Laird*, 443 F.2d 617, 619 (5th Cir. 1971) (summarizing the "test of administrative finality for purposes of judicial review"). Cotropia cites no evidence indicating that the TMB held the Final Order in abeyance pending review or gave overriding instructions permitting him to practice medicine between February 13, 2015, and March 20, 2015.

[3] Cotropia alleges another *Tolan* violation, noting that in its first sentence of background, the district court erroneously described the subpoena as an "administrative search warrant." That mistake, the argument goes, "shined a more favorable light on the unconstitutional actions of the administrative state, since a search based on a warrant would be reasonable under the Fourth Amendment." Cotropia devotes a solitary paragraph to this argument, and rightfully so. The district court conducted its analysis under the "Administrative Process Exception to the Warrant Requirement," demonstrating that the absence of a warrant was a baseline assumption of its analysis. Nowhere did the court suggest that Chapman's search was reasonable because she had a warrant.

No. 19-20688

poena directed Cotropia to produce copies of prescriptions and patient sign-in sheets from February 27, 2015, to the present.

Cotropia was away from his office that day, preparing for a hearing involving the TMB. Betty Spaugh, Cotropia's receptionist, remained at the office to handle communications with patients. Accompanied by a federal DEA agent, Chapman arrived at Cotropia's office and presented Spaugh with the administrative subpoena. After speaking on the phone with Cotropia's attorney, Spaugh requested that Chapman leave the office, but Chapman stayed.

Chapman removed several documents from Spaugh's desk and made copies.[4] Those documents included appointment ledgers, a patient payment ledger,[5] sign-in sheets, and five credit card receipts showing payments to "T.E. Swate."[6] After an hour, a constable arrived and told Chapman to

---

[4] Here, Cotropia alleges another *Tolan* violation, claiming that the district court erroneously concluded that "Chapman was provided twenty-three documents before Spaugh refused to produce additional records." Cotropia fails to explain how Spaugh's consent to the search is relevant to this appeal. In any event, consent is a separate basis for finding that a search is reasonable under the Fourth Amendment. *See City of L.A. v. Patel*, 576 U.S. 409, 420 (2015). Chapman relies on the administrative exception—not consent—to justify her search.

[5] Cotropia alleges another *Tolan* violation. The district court referred to those documents as "analogous to a patient log," although, the argument goes, they were actually "financial records" that are "outside the scope of the TMB's authority" to investigate. There are two problems with that theory—one legal, one factual. First, although 22 TEXAS ADMINISTRATIVE CODE § 179.4(a) allows the TMB to investigate only "medical records," Cotropia cites no legal authority suggesting that the presence of financial information undermines the TMB's authority over a document that otherwise qualifies as a medical record. Second, Cotropia claims that "Chapman conceded to seizing financial records belonging to Dr. Cotropia." But Cotropia mischaracterizes the record. When asked whether particular documents were financial documents, Chapman answered "They are—" before being cut off by an objection. When allowed to answer, Chapman said that the documents "have financial information."

[6] T.E. Swate refers to Tommy Swate, a physician who lost his medical license for

No. 19-20688

leave.

Cotropia filed this § 1983 action against Chapman for violations of his Fourth and Fourteenth Amendment rights based on Chapman's search and seizure of documents without a warrant. Chapman then moved to dismiss on the basis of QI. Although the district court granted Chapman's motion to dismiss with prejudice, we reversed. *See Cotropia v. Chapman*, 721 F. App'x 354 (5th Cir. 2018) (per curiam). We concluded that Cotropia "alleged sufficient facts to show that Chapman . . . violated the clearly established right to an opportunity to obtain precompliance review of an administrative subpoena before a neutral decisionmaker." *Id.* at 357.

In that appeal, we declined to adopt two of Chapman's arguments. First, although we noted that 22 Texas Administrative Code § 179.4(a) and Texas Occupations Code § 153.007(e)—which together constitute the TMB's subpoena authority—might provide the power to demand medical records on short notice, Chapman had not "made clear (on the arguments that she ha[d] provided thus far) whether § 179.4(a) applies to this situation at all." *Cotropia*, 721 F. App'x at 359.[7] Second, Chapman contended, at oral argument, that medical practices constitute "a

---

improperly treating chronic-pain and addiction patients. *See Swate v. Tex. Med. Bd.*, 2017 WL 3902621, at *1 (Tex. App.—Austin Aug. 31, 2017, pet. denied). Cotropia's 2015 practice involved the care of patients whom Cotropia took over from Swate. Swate now works as a licensed attorney and serves as Cotropia's counsel in this matter.

[7] Our previous decision did not examine Chapman's authority under Texas Occupations Code § 168.052 or 22 Texas Administrative Code § 195.3—which together authorize the TMB to inspect pain management clinics—because "Chapman ha[d] not argued that these provisions [were] sources of authority under which she operated." *Cotropia*, 721 F. App'x at 359 n.4. That led us to doubt whether Chapman's subpoena authority allowed her to "take the subpoenaed records by force." *Id.* at 359. On this appeal, Chapman has asserted her authority under §§ 168.052 and 195.3. Although Cotropia decries the TMB's taking of documents by "physical force," he does not contend that Chapman lacked authority to do so.

4

closely regulated industry and that the regulatory scheme TMB has in place provides a constitutionally adequate substitute for a warrant" under *New York v. Burger*, 482 U.S. 691 (1987). *Cotropia*, 721 F. App'x at 360. But because Chapman had not previously raised that argument, we declined to address it. *Id.*

On remand, after discovery, Chapman moved for summary judgment on the basis of QI. She argued that, because she reasonably relied on the Texas Administrative Code and Texas Occupations Code, her search was reasonable. The magistrate judge issued a Recommendation and Memorandum granting Chapman's motion, which the district court adopted in full, and Cotropia appeals.

## II.

After a defendant makes a "good-faith assertion of [QI]," the burden of proof for summary judgment purposes "shift[s] . . . to the plaintiff to show that the defense is not available." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) (quotation omitted). To satisfy its burden, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quotation omitted).

Cotropia contends that (1) Chapman violated his constitutional rights, by executing the administrative subpoena without any opportunity for Cotropia to obtain precompliance review, and (2) Cotropia's constitutional rights were clearly established at the time of the search. We agree that Chapman violated Cotropia's constitutional rights, but the law was not clearly established at the time of the search.

No. 19-20688

## A.

"Warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002) (quotation omitted). Two are relevant. First, as a general matter, "in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420. Second, even without precompliance review, there is an "administrative exception," the relevant test for which comes from *Burger*. *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019), *cert. denied*, No. 19-676, 2020 WL 3146691 (U.S. June 15, 2020). Under *Burger*, "warrantless inspections in closely regulated industries must still satisfy three criteria: (1) a substantial government interest, (2) a regulatory scheme that requires warrantless searches to further the government interest, and (3) 'a constitutionally adequate substitute for a warrant.'" *Id.* at 464–65 (quoting *Burger*, 482 U.S. at 703). Because Chapman did not have a warrant and Cotropia had no opportunity for precompliance review of the subpoena, we analyze whether Chapman complied with the administrative exception.

Last year, in *Zadeh*—a case factually similar to this one—we examined whether the TMB's authority to investigate the medical industry as a whole—and PMCs in particular—fell within the administrative exception under *Burger*. *Zadeh*, 928 F.3d at 466. We declined to apply *Burger* to the medical industry as a whole, because it "is not a closely regulated industry for purposes of *Burger*." *Id.* PMCs, on the other hand, are medical facilities in which "a majority of patients are issued on a monthly basis a prescription for opioids, benzodiazepines, barbiturates, or carisoprodol." Tex. Occ. Code § 168.001(1). Assuming that PMCs could be considered a closely regulated industry, we concluded that the TMB's administrative-subpoena authority for searching PMCs failed on the third prong of *Burger*. *Zadeh*, 928

F.3d at 466–68.  That prong requires "a warrant substitute authorized by statute to be constitutionally adequate." *Id.* at 467.  Constitutional adequacy in turn requires that "the regulatory statute . . . must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703.

*Zadeh* dealt with two sources of the TMB's authority.  First, §§ 153.007(a) and 179.4(a) grant the TMB authority to issue administrative subpoenas.  Those provisions, however, provide "no identifiable limit on whose records can properly be subpoenaed." *Zadeh*, 928 F.3d at 467.  Second, §§ 168.052(a) and 195.3 grant the TMB authority to inspect PMCs.  Those provisions, however, "d[o] not limit how the clinics inspected are chosen." *Zadeh*, 928 F.3d at 468.  Given the dearth of constraints, we concluded that both sources of the TMB's authority failed under *Burger*. *Id.*

In the instant case, like *Zadeh*, Chapman relied on Texas Occupations Code §§ 153.007(a) and 168.052 and 22 Texas Administrative Code §§ 179.4(a) and 195.3 as the sources of her authority to execute the administrative subpoena and search Cotropia's office.[8] *Zadeh*'s *Burger* analysis, therefore, controls the constitutional question here.  As Chapman concedes, "*Zadeh* already contains the very holding Cotropia asks the Court to announce in accordance with this constitutional analysis." Chapman thus violated Cotropia's constitutional rights when she copied documents in Cotropia's office without any precompliance review of the administrative subpoena.

## B.

With the first prong satisfied, we address whether Cotropia's right to precompliance review was clearly established at the time of the search.  In

---

[8] Unless otherwise noted, references to statutory provisions refer to the versions in effect on March 27, 2015, though they may have since been amended.

*Zadeh*, even though we concluded that the TMB's subpoena authority for searching pain management clinics was unconstitutional, we could not conclude that "every reasonable official prior to conducting a search under the circumstances of this case would know this *Burger* factor was not satisfied." *Zadeh*, 928 F.3d at 470. We "[did] not hold that all reasonable officers would have known that, until now." *Id.* *Zadeh* was issued in 2019; Chapman searched Cotropia's office in 2015. Thus, at that time, it was not clearly established that her search per §§ 153.007(a), 168.052, 179.4(a), and 195.3 was unconstitutional. Cotropia seeks to avoid that conclusion by differentiating *Zadeh* in several respects.

1.

Cotropia tries to distinguish *Zadeh* by reasoning that, unlike the office in *Zadeh*, Cotropia's office was "undisputedly _not_ a [PMC]." Because "it was clearly established at the time of this search that the medical profession as a whole is not a closely regulated industry," *Zadeh*, 928 F.3d at 468, Cotropia contends that "[e]very reasonable officer should have known that the closely regulated industry exception did not apply to the instant search of Cotropia's office."[9]

Cotropia is correct that his office was not registered as a PMC. The statute that provided the TMB authority to search Cotropia's documents, however, gives the TMB authority to investigate not only "a [PMC] certified

---

[9] Cotropia also styles this argument as a *Tolan* violation, claiming that "[t]he mistaken grant of summary judgement was entirely based on the false premise that Dr. Cotrpia's [*sic*] office was a pain management clinic." That is an odd assertion, given Cotropia's previous admission that "[n]either the court below nor Chapman have [*sic*] even attempted to claim that Cotropia's office was a [PMC]." In any event, although the district court described Cotropia's prior involvement with an unregistered PMC, the court distinguished New Concept, which was Cotropia's office that Chapman searched, noting that it was not registered as a PMC.

under this chapter" but also "a physician who owns or operates a clinic in the same manner as other complaints under this subtitle." TEX. OCC. CODE § 168.053. For instance, in *Zadeh*, 928 F.3d at 470–71, the relevant clinic was not required to be registered as a PMC for an officer reasonably to have relied on the regulatory scheme relevant to PMCs. It is thus irrelevant whether Cotropia registered his office as a PMC. The question, instead, is whether Chapman was investigating a complaint that Cotropia was operating his clinic in the same manner as a PMC. TEX. OCC. CODE § 168.053.

The record provides ample evidence that could lead a reasonable officer to believe that Cotropia operated New Concept in the same manner as a PMC. The TMB received allegations that Cotropia was operating an unregistered PMC. Cotropia, by his own admission, prescribed opioids through March 20, 2015, and previously had operated an unregistered PMC. His practice involved the care of patients whom he had taken over from Tommy Swate, whose medical license was revoked in 2014 for improper treatment of chronic-pain and addiction patients. Based on those undisputed facts, Chapman acted reasonably in relying on § 168.053 as authorizing her to investigate the allegations regarding Cotropia's practice.

2.

Cotropia claims that, unlike the physician in *Zadeh*, he is not a "licensee," and § 179.4(a) is limited to authorizing searches of "licensees."[10] He fails to fit the definition, the argument goes, because the TMB had already revoked his license before executing the administrative subpoena.

---

[10] In the first appeal, we noted that "Chapman has not made clear (on the arguments that she has provided thus far) whether § 179.4(a) applies to this situation at all, as Cotropia was not a 'licensee' at the time of Chapman's actions." *Cotropia*, 721 F. App'x at 359. Our previous opinion, however, did not benefit from an analysis of § 179.2(10), and it explicitly conditioned its conclusion on the arguments presented "thus far." *Id.*

No. 19-20688

But Cotropia's initial definitional argument cites no definitions. And for good reason. Section 179 defines its terms: "Licensee" refers to "[a] person to whom the board *has issued* a license." 22 Tex. Admin. Code § 179.2(10) (emphasis added). The present perfect tense, "has issued," indicates that "licensee" includes any individual who received a license at some point in the past.[11]

Other sections of the Texas Administrative Code reinforce the conclusion that Cotropia counts as a licensee. For instance, the Code refers to physicians as "licensees" even after their licenses have been canceled or surrendered.[12] We presume that a given word is used consistently throughout the text of a statute.[13] Section 179.4 thus does not limit "licensees" to those who presently possess a valid license. Given the statutory definition and context, Cotropia was a licensee at the time of Chapman's search.

In response, Cotropia supplants his "non-licensee" argument with an argument that, at the time of the search, he was "*not* a physician."[14] For that proposition, Cotropia cites 22 Texas Administrative Code § 176.1(6)—a different chapter of the Code from § 179.4's administrative-

---

[11] *See Barrett v. United States*, 423 U.S. 212, 216 (1976) (concluding that the present perfect tense "denot[es] an act that has been completed").

[12] *See, e.g.*, 22 Tex. Admin. Code § 196.2(a) ("When a licensee has surrendered his or her Texas medical license . . . ."); *id.* § 196.2(b) ("[A] licensee who reapplies for licensure must demonstrate that the licensee's return to the practice is in the best interest of the public.").

[13] *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167–73 (2012).

[14] Cotropia raises this version of his argument for the first time in his reply brief. "[W]e ordinarily disregard arguments raised for the first time in a reply brief." *Sahara Health Care, Inc. v. Azar*, No. 18-41120, --- F.3d ---, 2020 U.S. App. LEXIS 29927, at *9 n.5 (5th Cir. Sept. 18, 2020). Though Cotropia arguably waived this theory, it also fails on the merits.

subpoena authority—which defines a "physician" as "any person licensed to practice medicine in this state." He then grafts § 176.1's definition onto § 179.4, because the title of § 179.4 is "Request[s] for Information and Records from *Physicians*" (emphasis added). Even setting aside these statutory gymnastics, titles should be used in statutory interpretation only to resolve textual ambiguities, not to create a textual ambiguity that overrides a text's plain meaning. SCALIA & GARNER, *supra*, at 221–22.

Finally, Cotropia relies on the Cambridge Dictionary's definition of "licensee." But that doesn't supplant the definition by the Texas Legislature. Although we often use dictionaries in giving terms their ordinary meaning "[a]bsent a statutory definition," we need not resort to dictionary definitions where statutory definitions leave no ambiguity. *United States v. Hildenbrand*, 527 F.3d 466, 476 (5th Cir. 2008).

### 3.

Cotropia contends that, unlike the search in *Zadeh*, Chapman's search was pretextual.[15] Chapman violated clearly established law, the argument goes, because her search was done "solely to gather evidence of a crime . . . and potentially to harass." The district court concluded there was no pretext.[16] We agree.

---

[15] Once again, Cotropia describes this argument as a *Tolan* violation. Cotropia posits that practicing without a license has criminal penalties only under TEXAS OCCUPATIONS CODE § 165.153 but that it would be impossible for the TMB to bring administrative proceedings against him, as his "license had already been revoked." This appears to rehash Cotropia's "licensee" argument. As indicated above, the TMB retained authority to pursue actions against Cotropia even after his license had been revoked.

[16] The district court also concluded that the issue of pretext was "beyond the mandate of the remand" because Cotropia did not raise the issue in the district court before dismissal or before this court on his previous appeal. Cotropia contests that application of the mandate rule, and Chapman neglects to defend the district court's application of the mandate rule. Because there was no pretext, we need not decide whether the district court

"It is incorrect . . . to use the label 'pretext' simply because of an overlap between an administrative search and a criminal search." *Zadeh*, 928 F.3d at 471. States are free to "address a major social problem *both* by way of an administrative scheme *and* through penal sanctions." *Burger*, 482 U.S. at 712. Because a search can further both administrative and penal ends, we determine pretext by asking "whether the search that occurred was under a scheme serving an administrative purpose." *Zadeh*, 928 F.3d at 471.

The TMB had received a complaint that Cotropia was operating an unregistered PMC.[17] Even though Cotropia's license had been revoked at the time of the search, the Board still had the power to take disciplinary action against him, to issue administrative penalties, and to seek injunctions. *See* Tex. Occ. Code §§ 153.001(3), 164.001(b), 165.051. Therefore, Chapman's search served an administrative purpose, even if the TMB ultimately declined to take further administrative action against Cotropia. The search was not pretextual.

AFFIRMED.

---

properly applied the mandate rule.

[17] Cotropia repeatedly insists that Chapman knew or should have known that Cotropia was not engaged in the practice of medicine at the time of her search because it was a matter of public record that his license had been revoked as of March 20, 2015. But, particularly in light of the allegations against Cotropia, the Board and its investigators were under no obligation to presume that Cotropia was abiding by the revocation order (as he undisputedly had not from February 13 until March 20).

No. 19-20688

ANDREW S. OLDHAM, *Circuit Judge*, concurring:

I would avoid the constitutional question in this case. In *Zadeh v. Robinson*, 928 F.3d 457 (5th Cir. 2019), we held that certain searches by the Texas Medical Board ("TMB") violate the Fourth Amendment. I do not know whether *Zadeh* was correct as an original matter. For example, it could be argued that TMB resembles a guild. *See* TEX. OCC. CODE § 152.002(a)(1) (requiring 12 of TMB's 19 members to be licensed physicians); *id.* § 152.001 (empowering TMB to regulate physicians); *Guild*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A group of persons sharing a common vocation who unite to regulate the affairs of their trade in order to protect and promote their common vocation"). And guild searches have a rich common-law history. As early as 1297, a London city ordinance empowered six particular clothworkers to "examine and search" all rough clothwork before it left the city. WILLIAM J. CUDDIHY, THE FOURTH AMENDMENT: ORIGINS AND ORIGINAL MEANING 33 (2009). Guild searches persisted through 1485, *see id.* at 33–37; from 1485 to 1642, *id.* at 54; from 1642 to 1700, *id.* at 159, 173; and from 1700 to 1760, *id.* at 304–05, 412–14. Such searches (and the reactions to them) are part of the original public meaning of our Fourth Amendment. *See id.* at 727–73; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001) ("In reading the [Fourth] Amendment, we are guided by the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing . . . ." (quotation omitted)). Perhaps *Zadeh* accords with this history and meaning; perhaps not.

For present purposes, all that matters is that we needn't decide the question. *See Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009). Because regardless of whether the TMB investigator violated the Fourth Amendment, we all agree she is entitled to qualified immunity.

13