# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 17, 2021

Lyle W. Cayce
Clerk

No. 20-10757

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

PIZARRO THOMAS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CR-428-1

Before DAVIS, SOUTHWICK, and COSTA, *Circuit Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

Pizarro Thomas appeals from his conviction for being a felon in possession of a firearm. He challenges the district court's denial of his motion to suppress evidence of a firearm discovered during a stop and frisk. This case requires us to analyze the reasonableness of officers' suspicions as to a particular individual when the uncertainty is not whether a crime has occurred but who within a group committed it. We AFFIRM.

No. 20-10757

## FACTUAL AND PROCEDURAL BACKGROUND

On June 18, 2018, around 5:30 p.m., Officers Alan Hovis and Benito Garcia were patrolling the "Five Points" area of Dallas, an area known for pervasive crime involving drugs and violence. Earlier that day, the officers were informed that a vehicle stolen in an aggravated robbery had been identified in the area by an automatic license plate reader ("ALPR"). The officers were driving through the area in a marked patrol vehicle specifically for the purpose of locating the stolen vehicle, a silver Toyota Camry.

The aggravated robbery occurred on June 8, ten days before these events. The record does not make clear whether the officers were aware that the crime happened ten days earlier, though they knew it had not occurred in the last few hours. Information about the date of the crime was available to the officers and included in the National Crime Information Center ("NCIC") database that they accessed before making the stop.

The record shows the robbery was committed by two black males. At the time, though, the officers did not have a description of the people involved in the crime, and there is no indication that they knew how many individuals had been involved. What they knew was the description of the vehicle, its license plate number, the location where it was spotted by the ALPR, and that it was stolen in an aggravated robbery involving a firearm.

With that information, the officers drove to the apartment complex where the ALPR identified the stolen vehicle. As they drove through the complex, they saw the stolen vehicle backed into a covered parking spot near the entrance to one of the apartment buildings. They kept driving past the vehicle and, at that time, one of the officers confirmed via the NCIC database that the license plate matched that of the vehicle reported stolen.

During that initial pass, the officers observed two people sitting inside the stolen vehicle, while another four people — including Thomas — were

2

standing in the immediate vicinity of and surrounding the vehicle. According to Officer Hovis, the people outside the vehicle "were either touching it or talking to the people that were in it; talking no more than seven feet away from it." It appeared to him that all six people knew each other and were having a conversation as a group. Of the four people outside the vehicle, Thomas was standing closest to the vehicle, by the driver's side front tire.

The officers' suspicions as to Thomas were based entirely on his presence in a high-crime area, his proximity to the stolen vehicle, and his interaction with others in and around the vehicle. No crime unrelated to the presence of the stolen vehicle was witnessed. They could not overhear any of the group's conversation. There is no suggestion that either officer had encountered Thomas before or was aware of his criminal history.

Relying on what they observed and what they knew from the report of the aggravated robbery, the officers decided to stop and frisk these individuals, implicitly invoking their authority under *Terry v. Ohio*, 392 U.S. 1 (1968). The officers decided to detain all six people "[b]ecause they were around the [vehicle] that was taken in an aggravated robbery." They made a U-turn, drove back to the stolen vehicle, and stopped near it. They quickly exited, drew their firearms, and approached the group. According to Officer Hovis, the officers drew their firearms because the underlying crime "was an aggravated robbery, so a weapon [was] involved." That drove a concern that any or all of the people might be armed. Outnumbered six to two, the officers "wanted to surprise them and detain everybody without actually using any other force."

As they approached the group, the officers ordered everybody to get on the ground. All complied. The officers then handcuffed four of the six people, including Thomas, behind their backs as they were lying face down. They would have handcuffed everybody, but they only had four sets of

handcuffs. Thomas and the others were kept on the ground for about ten minutes.

At some point, the officers called for additional officers, who arrived shortly after Thomas was handcuffed. In the meantime, the officers began to frisk each person for weapons. Officer Hovis stated that it was necessary to frisk even those who were on the ground and handcuffed behind their backs because it remained possible for them to access a concealed weapon.

Officer Hovis eventually patted down Thomas and found a loaded firearm in his waist area. It was later determined to be stolen. Once the determination to arrest Thomas was made, other officers conducted a search incident to his arrest and found cocaine in his hat.

Relevant to one of Thomas's arguments on appeal, Officer Hovis could not recall whether he or any other officer questioned Thomas about the stolen vehicle. He testified that he "knew that [he] was most likely not going to" question Thomas about the aggravated robbery because Dallas Police Department policy prohibited an officer from asking questions about the underlying crime unless the detective assigned to the investigation was present.

Thomas was indicted in August 2018 for being a felon in possession of a firearm. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). He filed a motion to suppress evidence derived from the stop and frisk. He argued that it was not enough to justify the stop that officers saw him "in the vicinity" of the stolen vehicle and "reportedly saw him speak to the occupants." The Government opposed the motion, contending that the officers conducted a "by-the-book *Terry* stop and frisk."

Before the district court held a hearing, Thomas obtained new counsel and sought to supplement his arguments. In his supplemental brief, he argued that the circumstances of his detention — the officers' drawing their

firearms, ordering him to the ground, and handcuffing him — converted the investigatory stop into an arrest for which the officers lacked probable cause. He also argued that, even if *Terry* applied, the officers lacked reasonable suspicion to stop him or to frisk him.

At a hearing on the motion, Officer Hovis was the only witness to testify. The district court denied the motion, determining, first, that the officers discovered the weapon while conducting an investigatory *Terry* stop, not an arrest. Second, it concluded that it was reasonable to detain all six people because "[t]hey were in a high-crime area and surrounding a stolen vehicle." The court rejected the argument that the officers could detain only those inside the vehicle and needed to order the others to disperse. The court explained that such a requirement would not be "consistent with protecting the officers' safety." Third, the court explained that it was reasonable to suspect that any or all of the people were armed, given the circumstances of the underlying aggravated robbery. Fourth, it determined that the officers' showing of force, ordering Thomas to the ground, and handcuffing him were reasonable under the circumstances.

Thomas pled not guilty but agreed to have a bench trial. He stipulated that the Government could prove the basic facts necessary for conviction and reserved the right to appeal the denial of his motion to suppress. After the trial, the court found Thomas guilty of the firearm offense. The district court later issued findings of fact and conclusions of law based on the parties' stipulated facts. Thomas was sentenced to 30 months of imprisonment and 3 years of supervised release. Thomas timely appealed solely on the issue of the suppression motion.

## DISCUSSION

When a challenge to the denial of a motion to suppress is made, we review legal determinations *de novo* and factual findings for clear error. *United States v. Bolden*, 508 F.3d 204, 205 (5th Cir. 2007). We view the evidence in the light most favorable to the party who prevailed in district court — here, the Government. *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (*en banc*). The district court's ruling on a motion to suppress will be upheld if there is any reasonable view of the evidence to support doing so. *Id.*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Warrantless searches and seizures are *per se* unreasonable unless one of the recognized exceptions applies. *Cotropia v. Chapman*, 978 F.3d 282, 286 (5th Cir. 2020). The Government bears the burden of showing that a warrantless search or seizure fits within one of the exceptions. *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

One exception to the warrant requirement, first articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), permits officers to conduct "an investigatory stop (temporary detention) and frisk (patdown for weapons) . . . if two conditions are met." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). First, the investigatory stop must be supported by a reasonable suspicion "that the person apprehended is committing or has committed a criminal offense." *Id.* Second, assuming the initial stop is lawful, the officer may conduct a protective pat down if the officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Id.* at 327.

When conducting a stop and frisk, officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and

6

to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). The officers' manner of conducting the stop and frisk does not violate the Fourth Amendment unless they "were unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000).

Each police action must be "justified at its inception." *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004). "Reasonable suspicion must exist *before* the initiation of an investigatory detention." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020). Similarly, reasonable suspicion that the suspect is armed and dangerous must exist before an officer may conduct a frisk, *id.* at 491, but those facts may emerge after the officer initiates the stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977).

Thomas makes three arguments on appeal: (1) the stop violated the Fourth Amendment because the officers lacked reasonable suspicion that he was involved in criminal activity; (2) the manner in which he was detained — the officers' drawing their firearms, ordering him to the ground, and handcuffing him behind his back — converted the stop into a *de facto* arrest unsupported by probable cause; and (3) the stop cannot be justified under *Terry* because the officers knew that department policy prohibited their questioning him about the aggravated robbery, and therefore they lacked an investigatory purpose for the stop. We will consider the issues in that order.

I.      *Reasonable suspicion to support the stop and the frisk*

Reasonable suspicion to support an investigatory stop exists if the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). This standard is met if "specific and articulable facts" give rise to a suspicion that the person stopped "has committed, is committing, or is about to commit a crime." *Monsivais*, 848 F.3d at 357.

"[T]he level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). The standard "permit[s] officers to make commonsense judgments and inferences about human behavior." *Id.* at 1188 (quotation marks omitted). Moreover, the Supreme Court has repeatedly recognized that officers "need not rule out the possibility of innocent conduct." *Navarette v. California*, 572 U.S. 393, 403 (2014). Rather, observations capable of innocent explanation may, in the aggregate, amount to reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002). "[T]he essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account." *Cortez*, 449 U.S. at 417. Based on this framework, we must determine whether the officers had a particularized and objective basis for suspecting that Thomas was involved in the completed crime of an aggravated robbery.

One factor is that Thomas was encountered in a high-crime area, which provides some support for the stop. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing [or has committed] a crime." *Id.*

Thomas's connection to the stolen vehicle, through his close physical proximity and his association with others inside and around the vehicle, is another specific and articulable fact. In urging otherwise, Thomas contends that the stop was unreasonable because the officers lacked suspicions that were particularized to him. He argues that a person cannot be subjected to a *Terry* stop based solely on his proximity to another person suspected of criminal activity. He relies on a case from the Third Circuit for the proposition that "[t]he Supreme Court has never viewed *Terry* as a general

No. 20-10757

license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion." *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012).

Any "suspect's companionship with or propinquity to an individual independently suspected of criminal activity is a factor to be considered in assessing the reasonableness of a seizure." *United States v. Silva*, 957 F.2d 157, 161 (5th Cir. 1992). It was therefore relevant that officers saw Thomas's close interaction with a man sitting in the vehicle's driver seat, as the latter could be independently suspected of involvement in the aggravated robbery.

Thomas emphasizes the fact that he was not inside the stolen vehicle. He sees it as significant that a police report stated that the aggravated robbery was committed by "two African-American males," and that there were two people inside the vehicle while Thomas was outside. Further, he contends there is no evidence that he was exercising control over the vehicle. According to Thomas, these facts dispel reasonableness. Certainly, all the facts must be considered in judging reasonableness. Sometimes, "the presence of additional facts might dispel reasonable suspicion." *Glover*, 140 S. Ct. at 1191. In analyzing a *Terry* stop, though, the "facts [must] be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22.

There is no indication in the record that the officers knew how many people were involved in the crime or that such information was available. It was not shown that the report mentioned during the suppression hearing was available to the officers. Thus, the report's details are not relevant in our analysis. Looking at the actions of these officers from an objective standard, as *Terry* requires, it was not unreasonable for them to be uncertain how many people had responsibility for the earlier robbery. Further, regardless of how

9

many people had participated in the earlier crime, it was not unreasonable to suspect that those inside the vehicle might not be the culprits and instead were only being allowed to admire the vehicle stolen by someone standing outside. Thomas was standing next to the driver's door of the stolen vehicle, which could create suspicions that he was discussing with those inside some details of "his" vehicle. Again, all the officers needed was reasonable suspicion as to Thomas, not probable cause. We see nothing in the facts of this encounter that would have allowed the officers to rank which people in the small group next to or inside the vehicle were the most likely offenders. Based on the facts before the officers, it was not unreasonable to suspect that Thomas was involved in the aggravated robbery.

Thomas also argues that it is significant that ten days had passed since the aggravated robbery was committed. The passage of a meaningful period of time since a crime can be a factor in considering reasonableness. In some circumstances, the shorter the temporal gap, the more likely it is that someone in the vicinity of the crime was involved. *See Bolden*, 508 F.3d at 205, 207 (approving stop of vehicle driving "relatively fast" within one minute of hearing gunshots "around the corner"). In this case, the record is unclear about the officers' knowledge of the ten-day gap; they did at least know the crime had not occurred in the last few minutes. Based on his physical proximity to the stolen vehicle and his association with others next to and inside the vehicle, we cannot say that the passage of time since the vehicle was stolen eliminates the reasonableness of the officers' suspicions — of course, no certainty was needed — that Thomas was involved.

The Fourth Amendment does not require that the officers dispel all possible innocent explanations before stopping Thomas. *Arvizu*, 534 U.S. at 274–75. Objectively innocent activities may, in the aggregate, amount to reasonable suspicion of criminal activity. *Id.* Thomas contends that "he was simply visiting and socializing with other people at the apartment complex, a

10

completely lawful act." Even if that is correct, it does not eliminate the reasonableness of suspicion that Thomas, based on his proximity to the vehicle and his association with others inside and around it, was involved.

Turning to our related precedents, we agree with Thomas that some relied upon by the Government are not all that supportive. In one, officers encountered a man walking in front of a bar in a high-crime area. *Michelletti*, 13 F.3d at 839. At the sight of police, the man turned and ran behind the building housing the bar. *Id.* The officers followed and saw the man joining two others behind the building. *Id.* The officers stepped out of their vehicle and began to approach the group. *Id.* As they did so, a fourth man, Michelletti, "noisily pushed open the rear exit door from the bar and began to approach [an officer] and the suspects." *Id.* One of the officers frisked Michelletti and discovered a weapon in his pocket. *Id.* at 840.

We held that the stop of Michelletti was justified. *Id.* at 841–42. First, he emerged from the bar with a beer in his hand, in potential violation of alcoholic-beverage laws. *Id.* at 840–41. Second, he approached the suspicious group with "purposeful strides." *Id.* at 842. In total, he noisily barged out of the back of the bar with a beer in one hand, kept his other hand in his pocket, and approached the already-suspicious group with a "cocky," "alcoholic," and "deliberate" demeanor. *Id.* at 839, 842. The suspicions as to Michelletti were supported by observations particularized to him and indicative of criminal wrongdoing separate and apart from his relation to the suspicious group. Thomas, by contrast, did not engage in any suspicious conduct other than his proximity to the stolen vehicle and association with the group in the high-crime area. The reasoning of *Michelletti*, as a result, does not control the outcome here.

Others of our decisions have some similarities with this case, but they also involved additional facts indicative of criminal wrongdoing. In one, after

a bank robbery, we approved of the stop of a man who was observed approaching the vehicle used in the robbery, but he also matched the detailed description of the robber. *United States v. Campbell*, 178 F.3d 345, 347–48 (5th Cir. 1999). In another, we approved of the stop of a man who was seen "in the company of a suspected felon," but the man also fled from officers who ordered him to stop. *Silva*, 957 F.2d at 161.

These decisions are not a perfect fit because each involved suspicious circumstances in addition to physical proximity to a suspicious object, association with suspicious people, or the area being one of "high crime." Here, the officers had no prior knowledge about Thomas. The officers did not observe any other suspicious behavior, such as flight. *See Wardlow*, 528 U.S. at 124. They could not overhear any of the conversation going on among the people in and around the stolen vehicle. *See Sibron v. New York*, 392 U.S. 40, 62–64 (1968). Finally, there was no detailed description of any of the culprits whose description Thomas might have matched. *See Campbell*, 178 F.3d at 347.

Thomas urges us to rely on our recent decision in *United States v. McKinney*, 980 F.3d 485 (5th Cir. 2020). There, we held that officers lacked reasonable suspicion to stop a group of people at 9:00 p.m., standing on a sidewalk near a gas station that had been the subject of several drive-by shootings, the most recent at 4:00 a.m. that day. *Id.* at 488. The stop occurred in a "high-crime area" that "was residential and, presumably, people other than gang members lived there." *Id.* at 492. The court explained that the earlier drive-by shootings did not support stopping pedestrians "absent an articulable suspicion about a connection between the person and those crimes." *Id.* "Nothing observed by the officers connected [the suspects] standing on the sidewalk to the recent and nearby shootings that had been made from passing vehicles." *Id.*

We see a stark contrast between *McKinney* and this case.  The suspects in *McKinney* were standing on the sidewalk within a few blocks of the gas station where the shootings from passing vehicles had occurred.  They were not, for example, standing next to any vehicle, much less a vehicle similar to one identified as involved in the shootings.  Basically, in *McKinney*, the people whom police stopped had no identifiable connection to the offense but simply were in the same neighborhood hours later.  Here, though, Thomas was standing immediately next to the vehicle the officers knew had been stolen and was interacting with people inside and around the vehicle.

The judicious but, we believe, mistaken dissent asserts that our holding is inconsistent with the Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85 (1979).  In *Ybarra*, police obtained a warrant to search a bar and its bartender for evidence of drug offenses.  *Id.* at 88.  Upon their arrival, an officer frisked every patron inside the bar and found heroin in Ybarra's pocket.  *Id.* at 89.  The Court held that neither probable cause nor *Terry* suspicion justified the intrusion.  *Id.* at 91–94.  As to probable cause, the Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to *probable cause* to search that person."  *Id.* at 91 (emphasis added).  An evaluation of reasonable suspicion, of course, demands "less than is necessary for probable cause."  *Glover*, 140 S. Ct. at 1187.  Regardless, the decision to stop Thomas was not based on his proximity to a person already identified as the suspect of criminal activity.  Instead, no specific person had been identified as a suspect for the aggravated robbery; Thomas was one of a few people to whom suspicion reasonably attached.  Thomas's close physical proximity to a vehicle that was known to be stolen and his conversation with the person in the driver's seat provide support for suspicions particularized to him.

The *Ybarra* Court also held that *Terry* did not justify the frisk as it was "not supported by a reasonable belief that [Ybarra] was armed and presently

No. 20-10757

dangerous." 444 U.S. at 92–93. The officers here did have reason to suspect that someone involved with the aggravated robbery might again be armed.

The facts of this case can fairly be viewed as falling somewhere between *Ybarra* and *Maryland v. Pringle*, 540 U.S. 366 (2003). In *Pringle*, the Supreme Court held that an officer had probable cause to arrest all three occupants of a vehicle after none of them would claim ownership of cocaine found inside it. *Id.* at 372. The Court found "it an entirely reasonable inference . . . that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id.* Accordingly, "a reasonable officer could conclude that there was probable cause to believe [that the defendant] committed the crime of possession of cocaine, either solely or jointly." *Id.* This holding was based on the rationale that "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 373 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999)). In *Pringle*, "it was reasonable for the officer to infer a common enterprise among the three men." *Id.*

The dissent argues that the Government's position would be stronger if Thomas had been inside the stolen vehicle. Maybe, but we are not so sure. The scene officers encountered could reasonably suggest that the stolen vehicle was being displayed for others to admire, making it reasonable to be suspicious of someone standing outside the vehicle close to the driver's door, talking to the person in the driver's seat. Indeed, *Pringle* may well have more analogous facts than *Ybarra*. Both here and in *Pringle*, but unlike in *Ybarra*, officers initially had no reason to suspect a specific person. Thomas was one person outside the vehicle directly engaged with someone inside it.

Analyzing the holdings of *Ybarra* and *Pringle* under the lower threshold of reasonable suspicion, we conclude that the totality of

14

circumstances in this case, which include Thomas's proximity to the stolen vehicle and his interaction with others in and around the vehicle in this high-crime area, created reasonable suspicion that he was involved in the aggravated robbery.  The initial stop was lawful as to Thomas.

We hold that the officers were reasonable in suspecting that at least some of the people around and inside the vehicle had been involved in the aggravated robbery.  On the other hand, we are not holding that officers would have *carte blanche* to detain an entire group, no matter how large, simply because they have reasonable suspicion that among them is someone who has committed an offense.  Suspicion must be particularized based on the relevant facts.  Thomas and only a few others were surrounding a stolen vehicle and engaging in group conversation.  Thomas was the closest to the driver's seat, potentially explaining the details of his recent acquisition to those seated inside.

Thomas does not appear to challenge the officers' authority to conduct a frisk.  "[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326–27.  Assuming the initial stop was lawful, "[i]n order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry." *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010).  Further, "when someone engages in suspicious activity in a high crime area, where weapons and violence abound, police officers must be particularly cautious in approaching and questioning him." *United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) (*en banc*).

Officer Hovis testified that he believed Thomas might be armed because of "the nature of the crime and that he was standing next to the vehicle."  Because the group was surrounding a vehicle stolen in an

No. 20-10757

aggravated robbery involving a weapon, the officers "thought it was very likely that any or all of them were armed."

Thomas was reasonably suspected of involvement in the aggravated robbery. The robbery involved the use of a weapon, and the officers knew that. They were also outnumbered six to two and unable to secure all six people because they only had four sets of handcuffs. Based on these circumstances, the need to proceed cautiously was obvious, and it was reasonable to suspect that Thomas was armed and dangerous. Accordingly, the frisk was lawful.

II.    *Exceeding permissible scope of an investigatory stop*

Thomas contends that his detention was actually a *de facto* arrest requiring probable cause, not an investigatory stop requiring only reasonable suspicion. He argues that the officers' drawing their firearms, ordering him to the ground, and handcuffing him behind his back before frisking him converted the stop into an arrest.

Our analysis of whether the actions by officers prior to the discovery of Thomas's firearm exceeded the scope of a proper *Terry* stop is directed by the principle that officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235. "[U]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect — whether singly or in combination — do not automatically convert an investigatory detention into an arrest requiring probable cause." *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993). In a case involving an investigation into a bank robbery, we held that it was reasonable for an officer to draw his weapon, order the suspect to lie on the ground, and handcuff him before a frisk. *Campbell*, 178 F.3d at 349–50. In another *Terry* stop case, we held that it was reasonable to

16

detain a suspect at gunpoint, handcuff the suspect, and place the suspect in a police car. *United States v. Abdo*, 733 F.3d 562, 565–66 (5th Cir. 2013).

At the time of the stop, the officers were outnumbered six to two in a high-crime area known for drug and violent crime. Further, the crime they were investigating was an aggravated robbery involving a weapon. The officers made a judgment call "to surprise them and detain everybody without actually using any other force." According to Officer Hovis, Thomas and the others were kept on the ground for about ten minutes. On these facts, the officers' actions were reasonable. As to the length of the detention, apparently about ten minutes, *Terry* stops of that length are permissible. *See id.* at 566 (holding it reasonable to detain a suspect for 15 minutes); *Campbell*, 178 F.3d at 350 ("The entire detention took between 10 and 25 minutes — not an unreasonable amount of time under the circumstances.").

The officers' actions were reasonable under the circumstances, and the stop was not converted into an arrest prior to Thomas being frisked.

III.    *Department policy precluding investigatory questioning*

Thomas argues that his detention cannot be justified under *Terry* because, pursuant to a Dallas Police Department policy, the officers were prohibited from asking the detainees about the aggravated robbery because only the detective assigned to the offense is to question a suspect. According to Thomas, officers cannot rely on *Terry* unless they have an investigatory purpose in mind. Based on the department policy, Thomas argues that the officers in this case lacked the requisite investigatory purpose.

It would seem that accepting this argument could largely prohibit Dallas police from engaging in *Terry* stops. It is unnecessary, though, to explore how the dictates of the policy might have affected the proper rationale for the stop. The issue before us is whether the officers' conduct

No. 20-10757

violated the Fourth Amendment or, instead, was permissible under *Terry*. Whether a police department's specific policy limits officers from engaging in conduct that the Constitution permits has little relevance to the question of whether to suppress evidence due to a violation of the Constitution itself. The Supreme Court has held an arrest by state officers to be constitutional even though the arrest violated a more-stringent state-law limitation for minor offenses. *Virginia v. Moore*, 553 U.S. 164, 176 (2008).[1] The Court has "treated additional protections exclusively as matters of state law," and not as rules that affect the constitutional authority of law enforcement. *Id.* at 171. This court has used that principle to hold that a state's independent rules or policies on searches do not affect the constitutional validity of a search. *McCreary v. Richardson*, 738 F.3d 651, 658 (5th Cir. 2013).

The Dallas Police Department's local policy does not affect the constitutionality of the officers' conduct in this case.

AFFIRMED.

---

[1] At times, though, local policies and procedures are integral to the federal constitutional standard, such as with a reasonable local policy limiting the exercise of officers' authority in making inventory searches after an arrest. *See United States v. Hahn,* 922 F.2d 243, 246 (5th Cir. 1991).

No. 20-10757

GREGG COSTA, *Circuit Judge*, dissenting:

Reasonable suspicion is a low bar, *United States v. Sokolow,* 490 U.S. 1, 7 (1989), but it is a bar. I fear that today's ruling—finding reasonable suspicion based on proximity to, rather than possession of, property that was stolen days before—sets that bar closer to the ground than we ever have.

Three features of this case made it unreasonable to suspect Thomas of being a car thief. First, the officers conducting the stop and frisk had no description of the thieves to go off of. Second, officers saw two men inside the stolen car, making them (and not Thomas) the reasonable suspects. Third, the vehicle theft had happened well before police came upon Thomas standing near the car.

The lack of a suspect description is critical. *Terry* stops are routinely based on a description of the suspect (which, if detailed enough, may support reasonable suspicion). 4 WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(h)(1) (6th ed. 2020). A match with a suspect description often distinguishes an "unparticularized suspicion or 'hunch,'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968), from an individualized and thus reasonable one. So reasonable suspicion would exist to stop and frisk someone who matched a sufficiently detailed description of a car thief even if the suspect were standing next to, rather than sitting inside, the vehicle. *United States v. Davison*, 808 F.3d 325, 329–30 (8th Cir. 2015); *see also United States v. Campbell*, 178 F.3d 345, 348 (5th Cir. 1999) (finding reasonable suspicion when defendant "matched the physical description of the bank robber from the day before and was approaching a car that matched a detailed description of the getaway vehicle"). But that is not this case.

Nor is this a case in which the defendant was driving or sitting inside a stolen car. In that situation, the lack of a suspect description might not matter. LAFAVE, *supra*, § 9.5(h)(1) (noting that a physical description of the

19

suspect "may be of little use when the offender is traveling by car" in which case the suspicion turns largely on the descriptions police have of the vehicle). It is eminently reasonable to suspect someone inside a stolen car of being the car thief. Circumstances might even justify detaining someone close to a stolen car if the car is empty and there is reason to believe the person had been driving it. *United States v. Craddock*, 841 F.3d 756, 759 (8th Cir. 2016) (finding reasonable suspicion based on defendant's "proximity to the stolen vehicle and his demeanor" when an officer approached as the car had recently stopped and no longer had occupants). The logical inference is that the person driving or occupying a stolen car is the one who stole it. That commonsense conclusion undermines the reasonableness of suspecting someone else of the theft. Because here two individuals were inside the stolen car when police discovered it, it was much less likely that the thieves were standing next to it.

Finally, the officers knew the car theft was not a fresh crime (because the car was discovered by an automatic license plate reader, which would only generate an alert on the vehicle after the theft had been reported and the license plate entered into the system). Nor was the apartment complex where officers stopped Thomas the location where the aggravated robbery occurred; it was where the car later ended up. This renders inapplicable the legions of *Terry*-stop cases addressing detentions with close geographic and temporal proximity to crime scenes. *E.g.*, *United States v. Borden*, 508 F.3d 204, 206 (5th Cir. 2007) (finding reasonable suspicion when officers rounded a corner and stopped suspect "less than a minute" after hearing gunshots).

For some of these reasons, the majority correctly distinguishes the cases the government relies on to support the *Terry* detention. They involved defendants who fled or who "matched the detailed description" of a suspect. Maj. Op. 11–12 (discussing *United States v. Michelletti*, 13 F.3d 838, 839 (5th Cir. 1994) (en banc); *Campbell*, 178 F.3d at 348; *United States v. Silva*, 957

F.2d 157, 161 (5th Cir. 1992)).  But left hanging is the following question: If the government's authorities do not support the detention and frisk of Thomas, what does?  The absence of authority suggests that, despite more than half a century of *Terry* jurisprudence, no case has found reasonable suspicion based merely on proximity to stolen property when the defendant neither possesses the property nor matches a description of the thief.

Not only is there a lack of precedent for today's ruling, it is hard to reconcile with a Supreme Court decision holding that officers could not frisk patrons of a bar where they were executing a warrant for suspected drug trafficking.  *Ybarra v. Illinois*, 444 U.S. 85 (1979).  The bartender was the suspected drug dealer, so there was some logic to the officers' thinking that bar patrons might be his customers.  But that inference amounted to just a generalized suspicion of those in close proximity to the drug dealer.  Lacking was the individualized suspicion *Terry* requires.  *Id.* at 94 ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked*, even though that person happens to be on premises where an authorized narcotics search is taking place." (emphasis added)).  As Ybarra "gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening," *Terry* did not apply.  *Id.* at 93; *see also Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.").

The same absence of individualized suspicion characterizes this case.  To be sure, unlike in *Ybarra*, the suspected crime here (aggravated car robbery) involved violence.  That, however, supports a stop-and-frisk only of those reasonably suspected of involvement in the violence—the two people

No. 20-10757

the police saw inside the car.[1] *Ybarra* tells us that one does not become a crime suspect merely because other suspects are near. Just as the police could not frisk everyone in a shady bar, neither could they detain everyone standing by the stolen car. Where is the limit on this "close by" suspicion? Could one dozen, two dozen people milling around a stolen car all be stopped and frisked?

The majority offers *Maryland v. Pringle*, 540 U.S. 366 (2003), as a case with "more analogous facts" than *Ybarra*. Maj. Op. 15. When police find three people in a car with cocaine (as they did in *Pringle*) and none will admit whose cocaine it is, of course it becomes reasonable to suspect that the drugs might belong to any one of them. But the very things that made suspicion reasonable in *Pringle*—the occupants' ability to control the contraband and the likelihood that car passengers would be engaged in a common enterprise with the driver—are not present here. *See* 540 U.S. at 372–73.

The majority suggests that "it was not unreasonable to suspect that those inside the vehicle might not be the culprits and instead were only being allowed to admire the vehicle stolen by someone standing outside." Maj. Op. 10. That is based on nothing more than the officers' observation that Thomas was standing next to a stolen car and conversing with its occupants. This might be a different case had the police noticed that the car door was open, that Thomas was leaning into the vehicle, or that Thomas was pointing out the car's features to those inside. Because the officers saw nothing of the kind, they lacked a "particularized and objective basis" for suspecting that

---

[1] The armed officers were free to approach the stolen car and detain those inside. The officers could have asked the surrounding individuals to move away from the vehicle while they questioned the occupants. The officers could have thus acted safely on their reasonable suspicion of the car's occupants without stopping and frisking everyone in the vicinity.

Thomas had stolen the car and was showing it off to the occupants. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

As with most applications of the Fourth Amendment's reasonableness standard, *Terry* reflects a balancing of interests: "the neutralization of danger to the policemen in the investigative circumstance and the sanctity of the individual." *Terry*, 392 U.S. at 26. Individual liberty is not the only casualty of unjustified frisks; they "cannot help but be a severely exacerbating factor in police-community tensions." *Id.* at 14 n.11. The Supreme Court calibrated these competing concerns with the reasonable suspicion standard that requires a lesser showing than probable cause but still demands "suspicion directed at the person to be frisked." *Ybarra*, 444 U.S. at 94. Because that individualized suspicion is missing here, "the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." *Brown v. Texas*, 443 U.S. 47, 52 (1979).