# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 17, 2023

Lyle W. Cayce
Clerk

―――――――――

No. 21-10966

―――――――――

United States of America,

*Plaintiff—Appellee*,

*versus*

Abedel Sattar Alkheqani,

*Defendant—Appellant*.

―――――――――――――――――――――――

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CR-124-1

―――――――――――――――――――――――

Before Haynes and Engelhardt, *Circuit Judges*, and deGravelles, *District Judge*.[*]

John W. deGravelles, District Judge:

Abedel Sattar Alkheqani appeals the district court's denial of his motion to suppress on two grounds: (1) that officers lacked reasonable suspicion to initiate a traffic stop of his vehicle, and (2) that Alkheqani did not voluntarily consent to the search of his home and truck during the stop.

―――――――――――――――

[*] United States District Judge for the Middle District of Louisiana, sitting by designation.

No. 21-10966

Alkheqani also appeals his sentencing, arguing, *inter alia*, that the district court erred in relying on the Pre-Sentence Investigation Report ("PSR") to sentence him under the Armed Career Criminal Act ("ACCA") rather than any evidence required by *Shepard v. United States*, 544 U.S. 13 (2005). For the following reasons, we AFFIRM the denial of Alkheqani's motion to suppress but REVERSE the district court's application of the ACCA, VACATE his sentence, and REMAND for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Shooting and Traffic Stop

On March 29, 2020, around 3:49 p.m., in Arlington, Texas, 911 operators received several calls about a shooting. The gunshots were heard near a Boys and Girls Club. Callers reported arguing between men, yelling, and ultimately gunshots. A witness identified a dark-colored (black or gray), older pickup truck with a driver's side that needed to be painted and was lighter than the rest of the truck. Additionally, the description of the suspect was a male who was 5'10", had a dark-complexion ("black or Hispanic"), had facial hair and dark hair, weighed 160 pounds, and was in his late 20's.

Within minutes of these calls, officers with the Arlington Police Department arrived on the scene. Police spoke with a witness who described the suspect consistently with the 911 calls: a Hispanic male, late 20's or early 30's, 5'10", with black hair and black facial hair. Officers also obtained surveillance footage from the Boys and Girls Club that showed a darkish colored pickup truck leaving the parking lot. The vehicle had distinctive markings, some of which were consistent with the 911 calls; these markings included a driver's side passenger door that was lighter in color than the rest of the vehicle, a truck bed cover, and four stickers in the back window (two lighter colored ones in the lower left and lower right, one lighter colored in the center, and a bluish colored sticker in the top left area).

2

Police then drove the area and located a darkish colored Ford pickup truck matching the features of the vehicle and with the same stickers. The officers ran the license plate for the truck, and the registration came back with Alkheqani as the owner, a man whose ID photo showed he was Middle-Eastern, of dark complexion, and about 27 years old. As one officer indicated, "Alkheqani . . . could reasonably be seen as a dark-complected Hispanic male" and "also had black facial hair in his ID photo."

Police then kept surveillance of the house where the truck was parked, and they ultimately saw a Middle Eastern man matching the suspect's description leave the house in a red car. Officers followed the vehicle and conducted a traffic stop. The officers drew their pistols, aimed at the occupants, and ordered them to keep their hands up. The passengers were separated and detained.

Officers detected a strong odor of marijuana coming from the inside of the vehicle, so they conducted a probable cause search. Alkheqani was placed under arrest for possession of marijuana. Police released the other occupants.

Alkheqani was placed in the back of a squad car, and a rear dash camera captured his exchanges with officers. Police asked for permission to search Alkheqani's home and truck, and he granted it several times, even after officers said he could refuse.

Alkheqani was told he was under arrest for the marijuana. But, police also candidly told him that there was an incident earlier in which "[s]omeone got hurt[,]" that his vehicle matched the one seen, and that his physical description matched the suspect.

Again after being told he could refuse, Alkheqani signed consent-to-search forms. Alkheqani said he had nothing to hide.

Throughout his exchange with law enforcement, Alkheqani spoke English well and understood the officers, even going so far as to ask questions about the contents of the consent form. He also acknowledged that "it's not my first," which is consistent with his five prior convictions (four of which were for felony Burglary of a Habitation).

Officers asked him if he had any firearms in the house, and he replied, "I have a .22 rifle in the back room. It's my wife's, she uses it. Just for safety." During the search of the home, the .22 caliber rifle was found in the master bedroom.

## II. Procedural History

Alkheqani was indicted for one count of possession of a firearm by a convicted felon. He later moved to suppress the evidence acquired from the search of his residence and truck. Alkheqani argued that (1) officers lacked reasonable suspicion to pull over his car, so the stop was unlawful, and (2) he did not voluntarily consent to the search of his home and truck. The district court denied the motion, finding reasonable suspicion and voluntary consent.

On March 22, 2021, the matter proceeded to trial by jury. Three days later, Alkheqani was convicted.

The PSR was issued on May 19, 2021. The PSR noted in the facts:

A 911 caller that observed the incident[ ] reported they heard Alkheqani demand the victim, "Get on the ground, bitch." The caller reported Alkheqani then shot at D.D. multiple times while the victim was running away. . . . Investigators conducted an interview with D.D. who stated Alkheqani had demanded he give him food and money[ ] and told D.D. to get on the ground. D.D. responded he didn't have anything and fled when he was shot by Alkheqani.

The PSR gave a four-level enhancement for possessing the firearm in connection with Aggravated Assault with a Deadly Weapon because "[t]he defendant used a 9-millimeter firearm to shoot D.D. at least three times[.]" The PSR also enhanced the offense level to 34 based on the ACCA and Alkheqani's four prior convictions for Burglary of a Habitation.

The Government objected to, among other things, the cross-reference and argued that the PSR should have cross-referenced U.S.S.G. § 2A2.1 for Assault with Intent to Commit Murder or Attempted Murder. Alkheqani objected that, *inter alia*, (1) he did not possess a firearm or ammunition in connection with another felony offense, and (2) he was not an Armed Career Criminal. As to the latter, Alkheqani objected at the sentencing hearing that, though the burglaries occurred on separate days, they should be considered one criminal episode. But, Alkheqani did not object to the court's failure to consider only *Shepard*-documents and evidence.

At the sentencing hearing, the district court sustained the Government's objection and overruled Alkheqani's. The district court also adopted the probation officer's findings of fact in the PSR. The statement of reasons provides, "The Court concludes that USSG 2K2.1(c)(1) applies and the cross-reference to USSG 2A2.1 [does as well] because the defendant possessed the charged ammunition in connection with attempted murder. This cross-reference results in a Total Offense Level of 35." Alkheqani was sentenced to 324 months imprisonment as a career offender.

## DISCUSSION

### I. The Suppression Motion

Alkheqani now raises five issues on appeal, two of which involve the district court's denial of his motion to suppress. First, he argues that the police lacked a particularized and objective basis for suspecting he committed

the shooting when they initiated the traffic stop. Second, Alkheqani urges that he did not voluntarily consent to the search of his vehicle.

"When a challenge to the denial of a motion to suppress is made, we review legal determinations *de novo* and factual findings for clear error." *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (citing *United States v. Bolden*, 508 F.3d 204, 205 (5th Cir. 2007)). "We view the evidence in the light most favorable to the party who prevailed in district court — here, the Government." *Id.* (citing *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (*en banc*)). "The district court's ruling on a motion to suppress will be upheld if there is any reasonable view of the evidence to support doing so." *Id.* (citing *Michelletti*, 13 F.3d at 841).

### A. Reasonable Suspicion to Support the Traffic Stop

"'Whether an officer had reasonable suspicion to support a stop is treated as a question of law.'" *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017) (quoting *United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2021)). "Demonstrating reasonable suspicion is the Government's burden." *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020) (citing *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)).

"The Fourth Amendment protects individuals against warrantless searches and seizures." *Broca-Martinez*, 855 F.3d at 678 (citing U.S. Const. amend. IV). "It 'applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

"When a vehicle is stopped, the officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *Cortez*, 449 U.S. at 417–18). "'[R]easonable suspicion['] exists 'when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably

warrant the search and seizure.'" *Broca-Martinez*, 855 F.3d at 678 (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)).

"[T]he level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Thomas*, 997 F.3d at 610 (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020)). "[T]he essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account." *Thomas*, 997 F.3d at 610 (quoting *Cortez*, 449 U.S. at 417).

"Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022) (quoting *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008)). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *Id.* at 346 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Thomas*, 997 F.3d at 610–11; *McKinney*, 980 F.3d at 491–95; *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008)). "Facts that appear innocent when viewed in isolation can constitute reasonable suspicion when viewed collectively." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

Alkheqani argues that the district court erred in finding reasonable suspicion on three main grounds. First, Alkheqani contends that the officers were operating on generic information about the suspect and his vehicle rather than the requisite particularized facts. Second, Alkheqani maintains that the police improperly used conflicting and contradictory information to support the stop. And third, Alkheqani asserts that temporal and geographic proximity do not weigh in support of a finding of reasonable suspicion

No. 21-10966

because he was seized three hours after the shooting at a distance less than a mile away.

We disagree. In sum, we agree with the district court that (1) the stop was based on particularized, not generic, information; (2) minor conflicts in eyewitness accounts do not warrant a different finding; and (3) temporal and geographic proximity support a finding of reasonable suspicion. Thus, for the reasons provided below, we reject each of Alkheqani's arguments.

### 1. *Generic Information*

Alkheqani primarily relies on two cases in arguing that the information relied upon by the police was too generic: *Alvarez* and *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005) (per curiam). We find both distinguishable.

In *Alvarez*, the Fifth Circuit reversed the district court's finding of reasonable suspicion. *Alvarez*, 40 F.4th at 347–52. Because the case involved "completed criminal activity" rather than "a report of ongoing or very recent criminal activity[,] . . . the description of a Hispanic male who had once ridden a bicycle with large handlebars in a general area at some unknown time in the past [could not] justify the stop of Alvarez." *Id.* at 347–48. Further, the majority also found the "subject's physical description" to be "too general and vague" when "[o]ther than race and sex, [the officers] knew of no descriptors" and when descriptions of the suspect as "Hispanic" meant little in a predominately Hispanic or Latino community so that the description "fit too many people . . ." *Id.* at 348. As to the bicycle, "'[l]arge handlebars' pales in comparison to vehicle descriptions that have created or contributed to reasonable suspicion," and there was no evidence establishing that the "handlebars were sufficiently distinctive to create reasonable suspicion." *Id.* at 348–49 (citations omitted).

Likewise, in *Jaquez*, the Fifth Circuit reversed the lower court's denial of a motion to suppress and found reasonable suspicion lacking.

8

*Jaquez*, 421 F.3d at 340. The officer admitted at the hearing "that at the time she stopped Jaquez's car she had no specific information about the car reported to have been involved in the 'shots fired' incident other than the fact that it was red; she had no further description of that vehicle or its occupants." *Id.* Jaquez was stopped "only because (1) he was driving a red car, (2) in the general vicinity of the incident reported 15 minutes earlier, (3) late at night, (4) in an area known for its high crime rate." *Id.* The Court found, "The sparse and broadly generic information provided by the dispatcher, without more, was insufficient to support a determination of reasonable suspicion, as required under *Terry*." *Id.* at 341.

Unlike *Alvarez* and *Jacquez*, this case does not involve vague and generalized descriptions of Alkheqani or his vehicle. Alkheqani's truck was identified from witness descriptions and surveillance footage taken near the scene of the crime. As the district court explained, while trucks are certainly common in Texas, "the truck in the video had several distinguishing characteristics. It had a dark-colored bed cover; it had a marred paint job on the driver's side; and it had several distinctive stickers on the back window. Together, these attributes narrowed the field of possible trucks to a very small number." Likewise, officers located the truck and obtained Alkheqani's ID photo, and he substantially matched the description of the suspect: "in his 20s, with a dark complexion, and facial hair." Thus, *Alvarez* and *Jacquez* do not entitle defendant to relief.

Rather, this case more closely resembles those cases cited by *Alvarez* and *Jaquez* which found reasonable suspicion. *See United States v. Campbell*, 178 F.3d 345, 347–48 (5th Cir. 1999) (upholding stop where individual "matched the physical description" of bank robber and "was approaching a car that matched a detailed description of the getaway vehicle and bore the same license plate," namely "a late 1980s, black Chevrolet Cavalier with Tennessee license plate 600TTP"); *United States v. Brown*, 558 F. App'x

386, 392 (5th Cir. 2014) (per curiam) (holding "investigatory stop was justified at its inception" where victim identified vehicle as "look[ing] just like" the two suspects' truck and it "matched the make, model, and color of the vehicle . . . and had Florida license plates"); *United States v. Hall*, 557 F.2d 1114, 1117 (5th Cir.1977) (finding that officer was justified in making stop of "a red 1969 Ford driven by a light complexioned black male, proceeding away from the vicinity of a bank robbery within twenty minutes after the robbery" because "[t]he description of the car and the driver fit the cursory description of one of the robbers."). For these reasons, we reject Alkheqani's argument on this issue.

### 2. *Contradictory Information*

We next reject Alkheqani's complaints about the discrepancies in the witnesses' descriptions of the perpetrator and vehicle.[1] Alkheqani relies on *United States v. Rias*, 524 F.2d 118 (5th Cir. 1975), where the appellate court found no reasonable suspicion when an officer stopped two black men in a black Chevrolet on the grounds that, a few weeks before, "two black males in a black or blue Chevrolet were suspects in a series of Farm Store robberies," because, *inter alia*, the "officer was unsure whether the automobile . . . was black or blue" and "the only description of the robbers was that they were black males[.]" *Id.* at 119–21.

But *Rias* also does not entitle Alkheqani to relief. Numerous other appellate courts have recognized that minor inconsistencies in witness

---

[1] Specifically, one witness described the suspect as "dark complected," guessing he was Hispanic; in his late 20's; "average height, maybe a little bit . . . shorter . . . [m]aybe 5'10"ish;" "thin built;" with a "goatee;" with dark hair; and "probably about 160," while another witness said the suspect was Hispanic, 6'2", and about 190. Further, one witness described the truck as "black," while another described it as "gray" with the driver's side that needed to be painted.

descriptions are not automatically fatal to a finding of probable cause, and these cases apply *a fortiori* here, as reasonable suspicion demands even less than probable cause. *See United States v. Quinn*, 18 F.3d 1461, 1464 (9th Cir. 1994) (finding that "inconsistencies of the witnesses' descriptions of the robber [did] not negate the probable cause" when "there was evidence independent of the descriptions connecting the defendant to illegal activity.").[2]

As amply established above, the corroboration here went well beyond eye witness descriptions of the truck's color and included video showing the truck's highly distinctive features and Alkheqani's ID photo. Thus, the minor contradictions highlighted by Alkheqani do not warrant reversal.

### 3. Temporary and Physical Proximity

Finally, we turn to Alkheqani's last argument about reasonable suspicion. "A less specific description may support reasonable suspicion where there is temporal and geographic proximity to recent criminal

---

[2] *See also Ellis v. United States*, 264 F.2d 372, 374–75 (D.C. Cir. 1959) (affirming a conviction for burglary and finding of probable cause, even given "[s]uch inconsistencies as . . . complaining witnesses [ ] not agree[ing] in their estimates of age or height" because "the basic elements of the various descriptions were similar, and fairly matched Ellis' appearance."); *Burgess v. DeJoseph*, 725 F. App'x 36, 39 (2d Cir. 2018) (summary order) (affirming finding of probable cause after two witnesses identified the plaintiff as the shooter, despite "inconsistencies in the descriptions given by the interviewees," because "[t]here [was] no evidence . . . that either officer was aware of the inconsistencies," and "even if they were aware of the inconsistencies, they reasonably relied on the independent positive photo identifications when making the probable cause determination."); *Torry v. City of Chicago*, 932 F.3d 579, 588 (7th Cir. 2019) (Barrett, J.) ("Under our precedent, an imperfect match between a suspect and a description does not necessarily make an officer's suspicion unreasonable." (citing *D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (finding reasonable suspicion to stop a person "who somewhat matched the description of the suspect")).

activity." *Alvarez*, 40 F.4th at 347 (citations omitted). *See also Thomas*, 997 F.3d at 611 ("The passage of a meaningful period of time since a crime can be a factor in considering reasonableness. In some circumstances, the shorter the temporal gap, the more likely it is that someone in the vicinity of the crime was involved.") (citing *Bolden*, 508 F.3d at 205, 207 (upholding stop of car driving "relatively fast" within a minute of hearing gunshots "around the corner")); *Hall*, 557 F.2d at 1115–17 (upholding stop of man matching complexion of one of the suspects driving vehicle matching color, year, and brand of escape car when driver was "proceeding away from the vicinity of a bank robbery within twenty minutes after the robbery."). *Cf. also McKinney*, 980 F.3d at 488–93 (finding that drive-by shootings occurring at a gas station in a high crime area, including one at 4:00 a.m., did not justify a stop at 9:00 p.m. that day because there was no "connection between the person and those crimes").

The district court relied on temporal and physical proximity to support its decision. Specifically, the lower court noted that Alkheqani's vehicle was found "only three hours after the video was taken and less than a mile away" from the scene of the crime.

While Alkheqani does not dispute these factual findings, he maintains that they "are of little help to officers in the instant case," and he again relies on *Alvarez*, which also found that these factors did not support a finding of reasonable suspicion. In that case, as to location, "officers knew only that the subject had previously been seen in the Leopard–Up River area and 'may be' there. They had no information whatsoever about where in the area he had been seen or when he had been seen there—whether 'that day,' 'the day before,' or 'the week before.'" *Alvarez*, 40 F.4th at 349–50 (footnote omitted). "Nor did they have reason to believe he might still have been in the area—for example, if he resided there." *Id.* at 350 (citing, *inter alia*, *United*

*States v. Jones*, 619 F.2d 494, 498 (5th Cir. 1980) (finding description of suspect from robbery five weeks ago "stale")).

While the three hour, less-than-a-mile proximity here is not as close as *Bolden*, 508 F.3d at 205 (within a minute and "around the corner"), or *Hall*, 557 F.2d at 1117 (driving away from the "vicinity" of the robbery "within twenty minutes" of it), it is much closer in time than *Alvarez*, 40 F.4th at 350 (unknown whether suspect had been seen there "the week before") or *Jones*, 619 F.2d at 498 (five-week-old "stale" information). Thus, we find that temporal and physical proximity to the crime weighs in the Government's favor.

### 4. Conclusion

Again, "[t]he district court's ruling on a motion to suppress will be upheld if there is any reasonable view of the evidence to support doing so." *Thomas*, 997 F.3d at 609 (citing *Michelletti*, 13 F.3d at 841). Here, there was ample evidence supporting the lower court's finding, and, indeed, we agree with its conclusions. Consequently, we reject this assignment of error.

### B. Consent to Search the Home and Vehicle

"Whether consent was given voluntarily is a question of fact reviewed under a clearly erroneous standard." *United States v. Bass*, 996 F.3d 729, 739 (5th Cir. 2021) (citing *United States v. Blevins*, 755 F.3d 312, 326 (5th Cir. 2014)). "Factual findings are clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed." *Id.* at 736 (citation and quotations omitted). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (quoting *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001)). "The Government must prove [Alkheqani] voluntarily consented to the search by a preponderance of the evidence." *Id.* at 739 (citing *United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014)).

Consent is determined based on the totality of the circumstances, and this Court looks at six factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Perales*, 886 F.3d 542, 546 (5th Cir. 2018) (cleaned up). "Although all six factors are relevant, no single factor is dispositive." *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993)).

The district court found that one factor (custodial status) weighed in favor of involuntariness, one factor (belief that incriminating evidence would be found) was neutral, and the rest weighed in favor of voluntariness. Alkheqani disagrees, arguing that, at most, two factors support a finding of voluntariness, and four factors militate against it.

We will examine each of these factors in turn below. In sum, we find no clear error in the district court's analysis as to any individual factor or as to all factors as a whole.

### 1.  *Voluntariness of Custodial Status*

Both sides agree that because Alkheqani was under arrest at the time for possession of marijuana, the district court correctly concluded that this factor weighed in favor of involuntariness. However, as the district court stated, "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976). *See also United States v. Malagerio*, 49 F.4th 911, 917 (5th Cir. 2022) (affirming denial of motion to suppress because, though defendant's "custodial status was not voluntary, [ ] most or all of the

remaining factors tilt in favor of the search's being voluntary."), *cert. denied*, No. 22-6575, 2023 WL 3046174 (U.S. Apr. 24, 2023).

### 2. *Coercive Police Procedures*

Conduct falling under this category includes threats of force, promises, trickery, or deceit designed to pressure a suspect into consenting to searches or "more subtle forms of coercion that might flaw his judgment." *Watson*, 423 U.S. at 424. *See also United States v. Soriano*, 976 F.3d 450, 456–57 (5th Cir. 2020).

The district court found that, though there were some elements of coercion, this factor ultimately weighed in favor of voluntariness. Specifically, the traffic stop was initiated in a "highly coercive way," with officers having guns drawn and ordering the occupants from the vehicle, and there were multiple officers around Alkheqani. However, "all the other facts weigh against coercion," as (1) sufficient time passed between the stop and the consent so that "everyone was much calmer," (2) the officers spoke to Alkheqani "one on one, not in groups," in conversations with a polite tone, (3) "[p]olice never made any promises, threatened to get a warrant, or used any deception," and (4) officers "calmly explained his rights several times, including the right to say 'no.'"

Alkheqani maintains that the district court clearly erred in weighing this factor in favor of voluntariness. He notes, as the district court did, that he was ordered out of his car at gunpoint and was surrounded by multiple officers. Further, Alkheqani complains that deceit was in fact used, as officers falsely said they wanted to search in order to rule Alkheqani out as a suspect and that they would not search his car without him present. Finally, Alkheqani was handcuffed in the back of a police car, with four officers present, when he gave his consent.

Having reviewed the conversation between the officers and Alkheqani, we find that the district court did not clearly err in finding this factor weighed in the Government's favor. Even accepting that the officers told Alkheqani that he could be present for the search, he had already said several times that his house and car could be searched before those promises were made.

Further, Alkheqani claims the officers misrepresented they were searching for exculpatory evidence, but, when Alkheqani asked what was happening, the police forthrightly said that there was an incident earlier in which "[s]omeone got hurt," that his truck matched the suspect vehicle, and that his physical description matched the suspect's description. Thus, while there is some gamesmanship by the detective, this was not the kind of trickery designed to put pressure on Alkheqani to consent or impair his judgment. *See Soriano*, 976 F.3d at 456–57; *Watson*, 423 U.S. at 424.

Further, even accepting that these two facts weighed in favor of involuntariness, the other facts highlighted by the district court—the passage of time, individual conversations, no threat to get a warrant, and calm explanations of rights, including the right to refuse—remain in favor of voluntariness. At the very least, when viewing the evidence in a light most favorable to the Government, *Thomas*, 997 F.3d at 609, the district court's conclusion remains "plausible in light of the record as a whole." *Bass*, 996 F.3d at 736. Thus, there was no clear error here.

### 3. *Extent and Level of Defendant's Cooperation*

"Cooperation by the defendant is a factor favoring a finding that consent was voluntary." *Soriano*, 976 F.3d at 457. Even if a defendant expresses several instances of being nervous, this factor weighs in favor of voluntariness if the defendant is "more cooperative than not." *See id.* Here, Alkheqani concedes that, though he was nervous and frustrated at times, he

was "generally responsive and polite" and that the district court's finding on this factor is plausible. Thus, this factor also weighs in favor of voluntariness.

### 4.  *Defendant's Awareness of his Right to Refuse*

"An officer's failure to inform a suspect that he has a right to refuse to consent to a search militates against voluntariness." *Soriano*, 976 F.3d at 457 (citation omitted). Alkheqani concedes that he was told several times he did not have to consent and that his consent could be withdrawn. Consequently, this factor weighs in favor of voluntariness.

### 5.  *Defendant's Education and Intelligence*

The district court found that this factor weighed in favor of voluntariness. Alkheqani argues this was clear error, pointing to his ninth-grade education, repeated questions to the officers, and statements that he did not understand what was happening.

We find that the district court's conclusion was not clearly erroneous. As the lower court explained, "Alkheqani was 26 years old, spoke fluent English, and competently interacted with police;" while he had only a ninth-grade education, he had "substantial experience in the criminal justice system;" and though he asked many questions about the situation, his intelligent questions and responses "actually show his intelligence" and supports the conclusion that he "appears to have understood what was happening." At the very least, this conclusion is plausible in light of the record as a whole.

*Soriano* supports this conclusion. There, the Fifth Circuit found no clear error in the district court's finding that this factor "weigh[ed] marginally in favor of voluntariness[.]" *Soriano*, 976 F.3d at 457–58. The Fifth Circuit noted that defendant was "37 years old at the time of his arrest and had completed six years of formal education in Mexico." *Id.* at 458. The

appellate court's "review of the transcript of the traffic stop confirm[ed] that [defendant] was responsive to [the officer's] questions and understood the import of the traffic stop." *Id.* Moreover, the Fifth Circuit also agreed with the district court, which noted that defendant's "previous interactions with police indicated that [defendant] was not a newcomer to the law" and that "[defendant's] helpful demeanor during the stop, his interaction with the police, and his testimony indicated that he was at least of average intelligence." *Id.* at 457. Thus, there was no clear error. *See also United States v. Galberth*, 846 F.2d 983, 987–88 (5th Cir. 1988) (finding that defendant's "prior experience with the criminal justice system" also "weigh[ed] in favor of the district court's finding of a valid consent to the search").

The same reasoning applies here. Despite his limited formal education, Alkheqani's age; prior experience with the justice system ("No, I understand, it's not my first."); review of and question about the consent forms (*i.e.*, asking why the form asked about stolen property); and interaction with the officers as a whole make the district court's conclusion plausible. Thus, construing the evidence in a light most favorable to the Government, there is no clear error.

### 6. *Defendant's Belief Incriminating Evidence Would Be Found*

"An awareness or belief that no incriminating evidence will be found weighs in favor of a finding of voluntariness. Consequently, an awareness or belief that some incriminating evidence will be found weighs against a finding of voluntariness." *Soriano*, 976 F.3d at 458 (internal citation omitted).

The district court concluded this factor was "at best neutral, and perhaps weigh[ed] slightly in favor of voluntariness." On the one hand, Alkheqani "expressed worry that police would find marijuana in his house," but, on the other, he said "several times that he had nothing to hide" and "specifically admitted to police that he had a .22 rifle in the house."

Alkheqani urges clear error because he knew his house contained contraband, he expressed worry about additional drug charges, and he admitted to the rifle. The Government responds that neither shows clear error; for example, Alkheqani's admission about the rifle "signaled to police that he did not think it was incriminating[ ] because it was his wife's rifle." The Government also notes that, elsewhere in this case, Alkheqani tried to show that possession of the firearm was lawful under state law.

Both of these positions are supported by the record and are plausible, and this underscores why there is no clear error here. As the Government argues, Alkheqani did say numerous times he had nothing to hide, and a reasonable inference from his statement that "I have a .22 rifle in the back room. It's my wife's, she uses it," is that he believed there was nothing wrong with his wife possessing it. At the very least, we are not left with "a definite and firm conviction that a mistake has been committed," *Bass*, 996 F.3d at 736 (citation omitted), and there is no clear error, *see United States v. Kelley*, 981 F.2d 1464, 1471 (5th Cir. 1993) (finding that "the factors, considered as a whole, support[ed] the district court's finding [of] voluntar[y] consent," even where it was "unclear" whether consenting passenger/owner "believed that incriminating evidence would be found during the search" because "[p]erhaps she believed that the search would reveal only evidence that would incriminate [the driver], and not incriminate her.").

### 7. Conclusion

We agree with the district court that four factors weigh in favor of voluntariness, one indicates involuntariness, and one is, at most, neutral. Considering the record as a whole and the totality of the circumstances, and construing the evidence in a light most favorable to the Government, the district court's decision was plausible, so there is no reversible error. *See Soriano*, 976 F.3d at 455–58 (finding no clear error in district court's

conclusion that consent was voluntary based on the totality of the circumstances, even though three factors weighed in favor of voluntariness and three against); *United States v. Valentine*, 401 F.3d 609, 613 (5th Cir. 2005) ("Although reasonable jurists might reach different conclusions based on the evidence presented, we cannot say that the voluntariness conclusion was clearly erroneous.").

## II. Sentencing

Alkheqani's remaining issues raised on appeal involve his sentencing. We find that the last one—related to the ACCA—is dispositive, so we focus our analysis here.[3]

### *A. Standard of Review*

"This court reviews de novo the district court's application of the ACCA." *United States v. McGee*, 460 F.3d 667, 668 (5th Cir. 2006) (citing *United States v. Munoz*, 150 F.3d 401, 419 (5th Cir. 1998)). But if a defendant does not raise an ACCA argument in the district court, it is reviewed for plain error. *See, e.g.*, *United States v. Jenkins*, 487 F.3d 279, 281–82 (5th Cir. 2007) (applying plain error when defendant argued on appeal that the district court violated *Shepard* by relying on a PSR but did not specifically object to the lower court's consideration of the PSR); *United States v. Stevens*, No. 20-11264, 2022 WL 17832291, at *1 (5th Cir. Dec. 21, 2022) (per curiam) (reviewing under plain error when defendant argued "[f]or the first time on

---

[3] For the other two issues, Alkheqani argues: (1) that there was insufficient evidence to find that he committed the shooting so as to apply the cross-referenced U.S.S.G. § 2A2.1 for Assault with Intent to Commit Murder or Attempted Murder, and (2) that the district court committed plain error in applying § 2A2.1 because, even accepting the PSR's factual determinations as true, his conduct did not constitute Attempted First Degree Murder as a matter of law. Alkheqani's counsel stated at oral argument that if we agree with him on the ACCA, there is no need to decide these other issues. We agree.

appeal . . . that he should not have received the enhanced sentence because the Government failed to show that he had three qualifying prior convictions.").

Here, Alkheqani argued at sentencing that the ACCA should not apply because his prior convictions constituted a single criminal episode. However, he did not argue that the district court erred in failing to consider only *Shepard*-approved documents. Thus, we review the former *de novo* and the latter for plain error.

"To prevail on plain error review, [Alkheqani] must identify (1) a forfeited error (2) that is clear and obvious, and (3) that affects his substantial rights." *United States v. Velasquez*, 825 F.3d 257, 259 (5th Cir. 2016) (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009)). "If [Alkheqani] satisfies the first three requirements, we may, in our discretion, remedy the error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up).

### B. Parties' Arguments

The district judge relied solely on the PSR in applying the ACCA. The PSR found that Alkheqani had "four prior convictions for Burglary of a Habitation."

Alkheqani argues that the predicate offenses constituted, at most, only two criminal episodes under the Supreme Court's recent decision of *Wooden v. United States*, 142 S. Ct. 1063 (2022). According to Alkheqani, "the first two burglaries occurred within hours of each other—one late at night on April 15, 2012, and the other on the morning of April 16, 2012," and "[t]he remaining two . . . occurred within an hour of each other within the same block on May 12, 2012." Alkheqani contends that the district court erred in relying on the PSR to apply the enhancement rather than any documents required by *Shepard*.

The Government responds that (1) "[e]ven after *Wooden*, Alkheqani's burglaries—committed on three different days in four different locations—were committed on at least three different occasions;" (2) *Wooden* abrogated prior caselaw requiring *Shepard* documents; and (3) even if *Shepard* documents were required, the record reflects that four burglaries occurred on three different days, and that is sufficient under *Wooden*.

In reply, Alkheqani argues that (1) *Wooden* did not abrogate precedent requiring *Shepard* documents; and (2) the *Shepard* documents in the record do not conclusively show that the predicate offenses occurred on separate occasions, as they fail to include the locations or times of the offenses, and the information that is included strengthens Alkheqani's position that the burglaries only constituted two occasions.

## C. Whether the District Court Erred: <u>Wooden</u> and <u>Shepard</u>

The ACCA "mandates a 15-year minimum sentence for unlawful gun possession when the offender has three or more prior convictions for violent felonies like burglary 'committed on occasions different from one another.'" *Wooden*, 142 S. Ct. at 1067 (quoting 18 U.S.C. § 924(e)(1)). Before *Wooden*, the Fifth Circuit "[f]ollow[ed] *Shepard* [ ], to determine whether two offenses occurred on different occasions[.]" *United States v. Young*, 809 F. App'x 203, 209–10 (5th Cir. 2020) (per curiam) (citing *Shepard*, 544 U.S. at 16).

Under *Shepard*, "a court is permitted to examine only 'the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented.'" *Id.* at 210 (quoting *Shepard*, 544 U.S. at 16; *United States v. Fuller*, 453 F.3d 274, 279 (5th Cir. 2006), *abrogated on other grounds by Wooden*, 142 S. Ct. 1063). "In addition to *Shepard*-approved documents, a court may consider a defendant's admissions." *Id.* (citing *United States v.*

*Mendoza-Sanchez*, 456 F.3d 479, 483 (5th Cir. 2006)). But "a court cannot rely on a presentence investigation report's characterization of predicate offenses," *id.* (citing *United States v. Garza-Lopez*, 410 F.3d 268, 273–74 (5th Cir. 2005)), or on police reports, *id.* (citing *Shepard*, 544 U.S. at 16).

"Interpreting *Shepard*, this court holds that a district court errs when it solely relies upon the PSR's characterization of a defendant's prior offenses for enhancement purposes." *Jenkins*, 487 F.3d at 281 (citation omitted). *See also United States v. Wright*, No. 21-60877, 2022 WL 3369131, at *1 (5th Cir. Aug. 16, 2022) ("[U]nder *Shepard*, a district court is not permitted to rely on the PSR's characterization of a defendant's prior offense for enhancement purposes." (citing *Garza-Lopez* 410 F.3d at 274)). Thus, if *Shepard* remains good law, the district court erred in relying on the PSR alone.

The Government contends that no error was committed. According to the Government, post-*Wooden*, *Shepard* documents are no longer required to establish ACCA predicate offenses.

We disagree. In *Wooden*, the Supreme Court granted review with "the disputed question [being] whether Wooden committed his crimes on a single occasion or on ten separate ones" for purposes of the ACCA. 142 S. Ct. at 1069. The Supreme Court looked at the "ordinary meaning of 'occasion'" to define the term as "an event, occurrence, happening, or episode [which] . . . may itself encompass multiple, temporally distinct activities." *Id.* at 1069.[4]

---

[4] The Court explained:

The occasion of a wedding, for example, often includes a ceremony, cocktail hour, dinner, and dancing. Those doings are proximate in time and place[ ] and have a shared theme (celebrating the happy couple); their connections are, indeed, what makes them part of a single event. But they

No. 21-10966

In the criminal "sphere too, an 'occasion' means an event or episode—which may, in common usage, include temporally discrete offenses." *Id.* at 1070.

> The inquiry that requirement entails, given what "occasion" ordinarily means, is more multi-factored in nature. . . . [A] range of circumstances may be relevant to identifying episodes of criminal activity. Timing of course matters, though not in the split-second, elements-based way the Government proposes. Offenses committed close in time, in an uninterrupted course of conduct, will often count as part of one occasion; not so offenses separated by substantial gaps in time or significant intervening events. Proximity of location is also important; the further away crimes take place, the less likely they are components of the same criminal event. And the character and relationship of the offenses may make a difference: The more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion.

*Id.* at 1070–71. "In many cases, a single factor—especially of time or place—can decisively differentiate occasions. Courts, for instance, have nearly always treated offenses as occurring on separate occasions if a person committed them a day or more apart, or at a 'significant distance.'" *Id.* at 1071 (first quoting *United States v. Rideout*, 3 F.3d 32, 35 (2d Cir. 1993), and then citing *United States v. Riddle*, 47 F.3d 460, 462 (1st Cir. 1995) (per

---

do not occur at the same moment: The newlyweds would surely take offense if a guest organized a conga line in the middle of their vows.

*Wooden*, 142 S. Ct. at 1069–70.

curiam)). In "hard cases[,] . . . assessing the relevant circumstances may also involve keeping an eye on ACCA's history and purpose[.]" *Id.*[5]

The Supreme Court determined that this was not one of the difficult cases, as "every relevant consideration shows that Wooden burglarized ten storage units on a single occasion, even though his criminal activity resulted in double-digit convictions."[6] *Id.* at 1071. In reaching this conclusion, the High Court relied in part on the indictment as confirmation that offenses occurred on a single occasion. *Id.*

Thus, little in *Wooden* can be read as abrogating the requirements of *Shepard*. In fact, *Wooden* supports the continued vitality of *Shepard*, as the Supreme Court looked to the state-court charging document in support of its decision. *See id.*

Even putting this aside, as Alkheqani argues, the Fifth Circuit has twice looked at the ACCA after *Wooden*, and, on both occasions, the Court has emphasized the necessity of *Shephard* documents. *See Wright*, 2022 WL 3369131, at *1 (vacating *sua sponte* sentence because "[t]he district court relied on the PSR—and only the PSR—to find that Wright had the three

---

[5] With respect to history, "Congress added the occasions clause only after a court applied ACCA to an offender much like Wooden—a person convicted of multiple counts of robbery arising from a single criminal episode." *Wooden*, 142 S. Ct. at 1072. With respect to the purpose of the ACCA, Congress enacted the law "to address the special danger posed by the eponymous armed career criminal. The theory of the statute is that those who commit a large number of fairly serious crimes as their means of livelihood are especially likely to inflict grave harm when in possession of a firearm." *Id.* at 1074 (cleaned up). The statute "targets . . . those who have repeatedly committed violent crimes." *Id.* (cleaned up).

[6] The burglaries happened "on a single night, in a single uninterrupted course of conduct . . . at one location, a one-building storage facility with one address[;]" were "essentially identical" and "intertwined with the others[;]" and involved the "same scheme, actuated by the same motive, and accomplished by the same means." *Wooden*, 142 S Ct. at 1071.

requisite convictions," and, though the Court "examined the record, . . . no *Shepard*-approved documents [were] conclusive as to whether the predicate ACCA offenses occurred on separate occasions . . ."); *Stevens*, 2022 WL 17832291, at *1 ("When making this determination" of whether a defendant committed predicate offenses "'on occasions different from one another,' . . . a court may examine only '*Shepard*-approved' material . . ."). The Government complains that these cases are not binding precedent, but they remain highly persuasive, particularly in light of *Wooden*.

For all these reasons, *Wooden* did not abrogate *Shepard*. Consequently, the district court erred in relying on the PSR alone. *See Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023) ("If a precedent of this Court has direct application in a case, . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (cleaned up)).

### D. Whether A Substantial Right Was Affected: Review of <u>Shepard</u>-Approved Documents

We must next decide whether the lower court's error affected a substantial right. *Velasquez*, 825 F.3d at 259. "To satisfy the 'substantial-rights' prong, [Alkheqani] must demonstrate 'a reasonable probability that, but for the district court's [error], he would have received a lesser sentence.'" *Stevens,* 2022 WL 17832291, at *2 (quoting *United States v. Martinez-Rodriguez*, 821 F.3d 659, 663–64 (5th Cir. 2016) (internal quotation omitted)).

To answer this question, we must review the record to determine whether "*Shepard*-approved documents are conclusive as to whether the predicate ACCA offenses occurred on separate occasions[.]" *See Wright*, 2022 WL 3369131, at *1; *Stevens,* 2022 WL 17832291, at *2. If so, there is no reversible plain error, and the sentence will be affirmed. *See Stevens,* 2022

WL 17832291, at *2. If not, the sentence must be vacated. *See Wright*, 2022 WL 3369131, at *1.

Again, under *Wooden*, the Court is required to consider "a range of circumstances." *Wooden*, 142 S. Ct. at 1070–71. These include timing (such as whether the events consisted of "an uninterrupted course of conduct" or whether they were "separated by substantial gaps in time or significant intervening events"), "proximity of location" (with crimes taking place further apart considered less likely to be parts of the same criminal event), and the "character and relationship of the offenses" (such as whether they are "more similar [and] intertwined" or "share a common scheme or purpose"). *Id.* at 1071.

Here, the *Shepard*-approved documents in the record show four judgments and indictments for the crime of Burglary of a Habitation in Tarrant County, Texas, for the offenses committed on (1) April 15, 2012; (2) April 16, 2012; (3) May 12, 2012; and (4) May 12, 2012. None of the judgments or indictments list the time of the offenses. Further, locations are not definitively given, though four different victim initials are listed.

We find that these limited *Shepard*-approved documents do not "conclusively" show that the predicate offenses occurred on different occasions. The four offenses occurred on three different dates, but, as Alkheqani argues, no other details are given as to whether the burglaries occurring on April 15–16, 2012, happened "on a single night, in a single uninterrupted course of conduct . . . ." *Wooden*, 142 S. Ct. at 1071. Further, different victims imply different locations, but no detail is given as to the proximity of these victims to one another. Moreover, no information is given as to whether these events were "intertwined with the others" or involved the "same scheme, actuated by the same motive, and accomplished by the

27

same means." *Id.* Indeed, the fact that the same exact crime was committed in such a narrow span weighs in Alkheqani's favor.

In sum, the *Shepard*-documents do not conclusively show that Alkheqani's predicate offenses occurred on three separate occasions. Thus, the district court's error affected a substantial right, and we must vacate the sentence. *See Wright*, 2022 WL 3369131, at *1 ("Because no *Shepard*-approved documents are conclusive as to whether the predicate ACCA offenses occurred on separate occasions, Wilson's sentence must be vacated."). Further, given the fact that *Wooden* was decided after the notice of appeal was filed, we will remand the case for a full resentencing consistent with this opinion, at which time the Government may introduce any additional *Shepard*-evidence into the record.

## CONCLUSION

For the reasons discussed, we AFFIRM the district court's denial of Alkheqani's motion to suppress, REVERSE the district court's application of the Armed Career Criminal Act, VACATE the sentence, and REMAND for full resentencing consistent with this opinion.